UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

C.B., individually and on behalf of E.B.,
a child with a disability,

                              Plaintiffs                    DECISION AND ORDER

-vs-
                                                            08-CV-6462 CJS (P)

PITTSFORD CENTRAL SCHOOL DISTRICT,

                              Defendants.

_____


APPEARANCES

For Plaintiff:              Jason H. Sterne, Esq.
                            Law Office of H. Jeffrey Marcus
                            5888 Main Street
                            Williamsville, New York 14221

For Defendant:              David W. Oakes, Esq.
                            Harris Beach LLP
                            99 Garnsey Road
                            Pittsford, New York 14534


INTRODUCTION

        This is an action, pursuant to the Individuals with Disabilities in Education Act

("IDEA"), 20 U.S.C. § 1415(i)(2), Section 504 of the Rehabilitation Act of 1973, 29

U.S.C. § 794 *et seq.*, and Article 89 of the New York Stated Education Law, seeking

review of a decision of the New York State Department of Education.  Now before the

Court are the parties' cross-motions for summary judgment. (Docket Nos. [#17] [#19]).

For the reasons that follow, the applications are each granted in part and denied in part.

BACKGROUND

The Court has reviewed the administrative record in this action, which comprises several reams of paper. The following statement of facts will merely set forth the relevant highlights. Plaintiff CB ("Plaintiff")[1] is the parent of EB, a minor child with a disability. EB's learning disabilities, consisting primarily of dysgraphia[2], caused him to struggle academically in such areas as written expression, organization, and self-advocacy. EB's 2005-2006 individualized education program ("IEP") described him, in relevant part, as follows:

> [EB] has a severe discrepancy between his cognitive ability and his achievement in written expression. He has been diagnosed with dysgraphia. He expends [a] tremendous amount of energy just for handwriting, leaving little energy left to put his creative thoughts with proper mechanics accurately on paper. This causes a high level of frustration, and [EB] may be dealing with this frustration by activating defenses, such as delayed engagement in classroom activities. However, he is absorbing significant amounts of knowledge, in keeping with his cognitive ability.
>
> ***
>
> He is functioning in the high average range of cognitive ability. Test scores suggest that he is functioning in the superior range for nonverbal problem solving and in the average range for verbal reasoning skills, yet these scores are not commensurate with results of two previous sets of testing, indicating that his performance has not been consistent across evaluations.
>
> ***
>
> [EB] continues to need consistent reminders to follow through with a verbal request [from a teacher]. It has also been noted that [EB] has trouble advocating for himself. He finds it difficult to ask for assistance from peers or adults when he does not understand an activity.
>
> ***

---

[1] In the transcript of the administrative hearing, Plaintiff is referred to as "Mrs. EB."

[2] EB's 2005-2006 IEP states that "[s]ome typical characteristics of dysgraphia include generally illegible handwriting, inconsistencies in writing (mix of upper/lower case, irregular letter size, omission of letters/words), unfinished words, inconsistent organization on page with respect to lines and margins, and inconsistent spacing between letters/words." (*Id*. at 6).

In the area of mathematics, [EB] scored in the 98th percentile for math reasoning and 88th percentile for numerical operations. [EB] is able to grasp math concepts well and apply them to daily assignments and assessments.  However, it has been noted that [EB] makes careless errors,[3] especially involving computation.

***

[W]e have tried to encourage [EB] to use strategies for dysgraphia.  For example, a word processor or scribe for any lengthy written work is one strategy.  In the beginning of the year, [EB] was more receptive to using one of these two methods, but as the year progressed, he has been inconsistent with his cooperation.  Just recently, [EB] has been carrying his personal tablet PC to classes to use for notetaking; however, teachers do not see it being used on a consistent basis. . . .  The following are other strategies that have been practiced with [EB]: using a palm pilot or IPAQ to record assignments, using graph paper for math calculations, utilizing a scribe to record homework or test answers; and proofreading written work for errors.  These strategies have not been successful because of [EB's] reluctance to use them consistently and/or independently.

(2005-2006 IEP at 3-4).

During the 2005-2006 school year, EB was enrolled in the eighth grade in the Pittsford Central School District ("Defendant").  EB's 2005-2006 IEP called for him to be placed in a general education classroom, with resource room daily for 37 minutes, occupational therapy ("OT") twice a month for 37 minutes, and OT consultation for 40 minutes once per month.  Resource Room was intended to address EB's writing deficiencies. (2005-2006 IEP at 2) ("[EB] has difficulty with many aspects of the writing process, including brainstorming, organization, editing, and revising.  Resource room support is necessary for [EB] to be provided with support in the area of writing.").  OT consultation was intended to address EB's dysgraphia, and to improve fine motor skills and provide modification strategies.  The district provided EB with a word processor to

---

[3]Plaintiff does not agree that EB's errors were due to carelessness. (Mrs. EB testimony at 670). The Court notes that the transcript of the administrative hearing refers to Plaintiff C.B. as "Mrs. EB."

use at school, and Plaintiff also provided EB with a tablet personal computer ("Tablet PC"), which he carried with him to classes. The IEP called for the district to conduct an Assistive Technology evaluation for EB. On October 31, 2005, the district completed such evaluation, which "revealed a need for continued training and support for the use of [EB's] tablet PC and other current technology within all academic settings." (2005-2006 IEP as amended, December 16, 2005). On November 2, 2005, Plaintiff complained to the district that EB was not receiving appropriate support in assistive technology. (Mrs. EB hearing testimony, at 661-662) ("It is now the beginning of November. [EB] is not receiving any assistive technology training nor exploration of additional technology to ease his dysgraphic difficulties and help him with notetaking."). Subsequently, the district modified the IEP to include 20 hours of assistive technology support in the resource room. (*Id*.). On March 31, 2006, Christie Rochester ("Rochester"), the district's Assistive Technology Coordinator, indicated that EB was familiar with Efofex software, but did not need it to complete his assignments. (Rochester Report dated March 31, 2006). Rochester further noted that, although she had previously recommended that EB use "word prediction or draft writing software," "[h]is keyboarding skills [were] too advanced to utilize the word prediction [software] and the draft writing software ha[d] been replaced by hard copy outlines provided by the teacher." (*Id*.). Rochester further recommended that EB receive ten hours of assistive technology support during the next academic year. (*Id*.). However, as discussed further below, the Committee on Special Education ("CSE") increased that recommendation to twenty hours of assistive technology support. At the impartial hearing, Rochester testified that EB was a proficient typist, and that although he was able to use the

supportive software, he did not use it consistently. (Rochester hearing testimony at 119-124).  Rochester indicated that EB did not need a scribe[4] as part of his 2006-2007 IEP, because he was able to type his class notes. (Rochester hearing testimony at 132-133) ("He was a proficient typist, he could have typed notes.  His tablet PC that he had also had handwriting recognition software, there were times he would scribble notes on it.").

On March 30, 2006, Rebecca Davidson ("Davidson"), Occupational Therapist, completed a report concerning attempts to improve EB's handwriting.  Davidson stated that EB had been provided with direct OT support "and a variety of strategies," but his handwriting was inconsistent.  (Davidson Report dated 3/30/05 at 1) ("[EB] does not consistently utilize the strategies and modifications provided in order to help him with the challenges of dysgraphia.").  Davidson stated that EB "can demonstrate functional handwriting skills when [he] uses good handwriting posture and slows the pace of his writing." (*Id*.).  Davidson further indicated that EB would not need direct OT support in high school, but that he should continue to receive OT consultative support:

> This year the occupational therapist was able to provide [EB] with strategies to help improve his fine motor skills as well as the opportunity to practice the strategies.  It is now up to [EB] to consistently utilize these strategies in the High School setting.  It is recommended that [OT] consultation be provided next year 5 times per year in order to monitor [EB's] progress and provide [his] teachers with support as needed.

(*Id*.).

On May 13, 2006, Jessica Sabbour ("Sabbour"), Learning Specialist for the district, completed a report detailing the results of various evaluations completed between December 2005 and May 2006.  Sabbour stated that EB "continue[d] to show

---

[4]Under the 2005-2006 IEP, EB was provided a scribe to take notes for him.

average to above average achievement across all academic areas." (Sabbour report at 2). Sabbour noted that EB's handwriting "indicates that he has graphomotor difficulties which often impact the readability of his writing," and that EB performed somewhat better using a word processor. Sabbour further observed:

> [EB] has difficulty with homework completion and organization. Time management is also a challenge for him. It is difficult for [EB] to complete work independently during class, regardless of the environment, as he gets distracted or avoids the task being asked of him. Graphomotor tasks are challenging for him, however, he typically slouches down completely in his chair while doing work and uses only one hand while writing, thus the paper moves and his handwriting is unsteady. When reminded that it would improve legibility of his work, he will take mini-steps requiring further prompting until he is in the proper position, or he will refuse to change altogether. He receives a great deal of assistance at home although he is resistant to help offered to him there and at school. [EB] has been shown many different strategies and has had a wealth of resources made available to him that he appears to be resistant to using. He does not like to go in for extra help and often misses appointments that are scheduled for him. [EB] needs constant reminders to attend to a task, bring the required materials to class, and show up for appointments. These difficulties prevent him from achieving the success he is capable of on a daily basis.

(*Id*. at 4-5).

Comments by EB's teachers at the end of the 2005-2006 school year generally indicate that EB resisted using the various strategies that he had been shown. For example, EB's English teacher stated:

> [EB] still needs quite a bit of prompting to use pre writing strategies during writing assignments. Even with that prompting, he finds limited success in accomplishing the task at an eighth grade level of development. He is resistant to accept help so it is difficult to do much else than prompting and that can become a frustrating situation.

(Englerth 40-week comments). EB's Spanish teacher stated:

> I am disappointed with [EB's] performance in Spanish. He seemed to be starting out the year relatively well and then by the middle of the third

quarter he seemed to completely shut down.  He began to become more unfocused and although I would use a variety of cues, prompts, [and] multisensory approaches he would continue to be unresponsive.  He did not come in for extra practice with the oral part of the state exam and his score this section was low.  He finished out the year completing almost next to nothing.  I gave him opportunities to make up the missed homework assignments however he never handed anything in to me.

(Laboarne 40-week comments).  Nevertheless, EB "finished 8th grade with 4 courses in the 'C' range for final grades, 3 courses in the 'B' range and 'E' (i.e. 60) in Spanish and A- in physical education." (Plaintiff's Notice of Intention to Seek Review ¶ 44).  According to Patricia Brogan ("Brogan"), Defendant's Director of Special Education, EB "did pretty well in 8th grade." (Brogan hearing testimony at 231).

Plaintiff disagreed, and stated that in the Spring of 2006, she realized that Defendant was not providing EB with an appropriate education.[5]  In June 2006, Plaintiff "accepted the likelihood" that Defendant would not provide EB with an appropriate education, and she notified Defendant that she was "poised to remove [EB] from the public school and place him at the Gow School [("Gow")]," a residential school for dyslexic boys in grades seven through twelve.[6]  (Plaintiff's  Affidavit at ¶ 8).[7]  Gow's highly-structured program included scheduling of each day's academic and non-academic activities.  Gow students attend classes each week day, and half a day on Saturday.  Additionally, Gow students attend faculty-monitored study halls each night,

[5] In March 2006, Plaintiff hired an educational consultant, Ellen Arnold, Ed.D. ("Arnold"), "in an effort to supplement the inadequate program provided by the district." (Mrs. EB [C.B.] Affidavit ¶ 4).

[6] Plaintiff states that "[r]esearch suggests that students with disabilities' self-concept is better when attending specialized schools." (Complaint ¶ 44) (See also, Mari Jo Clayback hearing testimony at 591-593).

[7] The Court considers Plaintiff's affidavit as "additional evidence" pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii).

and on Saturday afternoons as needed. (David Mendlewski hearing testimony at 503-505) (See also, Mari Jo Clayback hearing testimony at 588) ("[W]e know that our [Gow] students do better with that sort of structure. If work is predictable, if their time is predictable and they know exactly what they need to do and when and they are in a routine, then they are going to do better and EB fits right in with those students.").

Plaintiff had EB independently evaluated by Dr. Peter Sorman ("Sorman"), a pediatric neuropsychologist. Sorman concluded that EB's

> writing is very poor and is as good as it is going to get graphomotor-wise. Extensive efforts to improve his penmanship aren't likely to pay off, so we should figure out how to use technology to replace his graphomotor writing deficiencies, and continue to take advantage of simple technology to improve the graphomotor writing that [EB] does have to do.

(Plaintiff 8/3/06 letter to CSE summarizing Sorman report).

Subsequently, the CSE completed the proposed IEP for the 2006-2007 school year. Such process involved six separate meetings, which was an unusually high number. Brogan explained why so many meetings were required: "We had a lot of information to cover, parents had a lot of questions about his programs and services, we have evaluations that were taking place to address and review. There was a lot of information to cover and a lot of questions to answer." (Brogan hearing testimony at 195). The IEP recommended placing EB in a general education classroom, with consultant teacher services in English and Social Studies,[8] and with forty minutes of

---

[8]The "consultant teacher services" consisted of classes "co-taught" by two teachers, a general education teacher and a special education teacher. The class would have twenty-four students, of whom, at most eight would have IEPs. Sabbour testified that, "[a]t the high school, consultant teacher service provides for another teacher in the classroom, a special education teacher in a general education classroom. We call it co-taught class. Where the teacher would be involved in . . . planning with the general ed teacher, executing a lesson with the general ed teacher and providing supports right within the classroom for a student with disabilities alongside their general ed peers." (Sabbour hearing test. at 60).

resource room each day. Brogan indicated that the consultant teacher arrangement in English and Social Studies would provide EB with writing support. (Brogan hearing testimony at 352) ("Within the general education classroom, the writing support is build right into the classroom with the special education teacher in the classroom."). Brogan stated that the consultant teacher arrangement was appropriate in English and Social Studies classes, since they are "heavily laden with writing responsibilities." (*Id*. at 373). Brogan testified that the consultant teacher arrangement "was the best way to address [EB's] organizational, written expression and attentional motivational issues as well as then maintaining a resource room program for additional skill development and support in all of those areas." (*Id*. at 408).

The resource room was recommended to help EB with organization, homework completion and management, and writing. (Sabbour hearing testimony at 62-63). The IEP also recommended five 40-minute OT consultations and 20 hours of assistive technology support. The IEP indicated that the resource room was intended to help EB with organization, self-advocacy, time management, and writing skills. The IEP further stated that, "[d]ue to [EB's] dysgraphia, OT consultation will be provided to monitor [his] fine motor skills and provide modification strategies as necessary." The IEP also provided for various testing accommodations related to EB's dysgraphia. With regard to transitional services, Brogan indicated that the IEP contained activities designed to support EB in is plan to eventually attend college. (Brogan hearing testimony at 213) ("We certainly identified [that EB] had an interest in going to college, so that was placed in the IEP with appropriate activities to support that.").

Plaintiff rejected the IEP proposed for the 2006-2007 school year. In general,

Plaintiff indicated that the IEP failed to ascertain the reasons for EB's inconsistent use of technology and instructional strategies, and failed to provide EB with sufficient structure and support to enable him to complete his homework. More specifically, Plaintiff maintained that the IEP called for consultant teacher services in an 8:1 ratio, without distinguishing between direct and indirect services. Plaintiff did not think that a co-taught class would be helpful to EB: "I felt that students who did not have IEPs would be taking the attention of the two teachers and my child would still be in trouble." (Mrs. EB testimony at 682). Brogan testified that in a co-teaching classroom, both teachers share responsibility for the entire instructional process, and "[t]he special education teacher has responsibility for the 8 students [with disabilities]." (Brogan hearing testimony at 474). Brogan indicated that both the general education teacher and the special education teacher would "share responsibility for making sure that all of the students in the class were using strategies that were expected of them[.]" (*Id.* at 475).

By letter dated June 23, 2006, Plaintiff informed Defendant that she was removing EB from the Pittsford School District and enrolling him at Gow. (Plaintiffs' Statement of Material Facts [#19-2] ¶ 49). About her decision to place EB at Gow, Plaintiff states:

> We were desperate. We could not help him anymore at home to the degree he needed to be helped. He was not advocating for himself, he was not trusting adults, he did not trust his teachers. He would not look people in the eye, would not shake their hand. . . . [H]e couldn't write an essay, he couldn't do a DBQ [document-based question], how was he going to make it through high school when everything was becoming more dependent on writing.

(Mrs. EB hearing testimony at 684). On July 19, 2006, Plaintiff wrote to the CSE, and

stated, in relevant part, that

> [EB] does not have the skills to handle high school assignments nor the routine of high school. He does not have the ability to plan ahead and execute a long-term project. Due to the severity of his written and oral expression difficulties [EB] cannot accomplish what will be required of him in high school without considerable adult assistance. [EB] needs intensive individualized teaching in a small environment to learn strategies for being a successful, independent learner despite his disabilities; large co-taught classes will not work for him.

(Plaintiff's 7/19/06 letter to Brogan). Specifically with regard to homework, Plaintiff believed that EB needed a school that would provide "evening support that EB needed for homework." (Mrs. EB hearing testimony at 705); (*See also, id*. at 714) ("His needs for assistance in getting the work done after school hours was 4 or 5 hours' worth of work and this is middle school, so very unusual for a child to have 4 to 5 hours' worth of work, which indicates to me that his needs were way beyond our [EB's parents'] ability to help him[.]").

EB attended the ninth grade at Gow. At Gow, an evaluator, Mari Jo Clayback[9] ("Clayback"), suspected that EB had "mild dyslexia." (Clayback hearing testimony at 546, 552, 572). In Clayback's opinion, EB needed "direct remediation of written expression." (*Id*. at 575). Clayback stated that such remediation related to EB's "[h]andwriting and expressing himself through writing." (*Id*. at 576). Gow placed EB in one-on-one training with a "Reconstructive Language teacher," once per week for fifty minutes. (*Id*.). Reconstructive Language is a "core program" at Gow, and was developed at Gow. (Mendlewski hearing testimony at 495-497). "Reconstructive

---

[9]Clayback holds a Ph.D. in developmental psychology. (Clayback hearing testimony at 540). Clayback does not hold any certifications or licenses. (*Id*. at 541).

Language is the remedial reading course that all the students [at Gow] take[.] [It starts] with the fundamentals and build[s] up through some more advanced study of Greek and Latin roots and prefixes[.]" (*Id*. at 495-496). The program "focuses" on phonics, phonemes, spelling, and reading comprehension. (*Id*. at 496) (*See also*, Clayback's description of Reconstructive Language teaching, Clayback hearing testimony at 578-579) (*See also*, hearing testimony of Brendan Tarry ("Tarry") at 638-642, indicating that Reconstructive Language class generally involves the remedial study of phonics).

Plaintiff states that at Gow, EB still "had some late assignments, especially around the writing," but that EB attended Gow's Saturday study halls, "so he never got very far behind." (*Id*. at 685). Plaintiff stated that EB showed some improvement at Gow:

> He seems to be more efficient at Gow. He seems to be more productive at Gow. His writing is coming faster, though still he doesn't always get it in on time. . . . EB's needs seem to be met better at Gow. I don't need to be involved because they are [sic] through study halls at night are able to monitor where he is and teachers who know the curriculum and his own teachers are assigned to those study halls, so he is able to ask assistance when he needs it or they are able to continue to monitor him as they are teaching him to advocate more for his own needs, so I – there isn't really anything where I need to communicate. I do – I am informed when he is late and he is going to have a Saturday study hall and those are getting fewer and fewer.

(*Id*. at 686-687). However, EB's writing and organization problems persisted at Gow, even with the additional support provided there. (*Id*. at 706) ("He still has a writing disability and he hasn't gotten a handle on that yet, so yes, he still has late assignments.").

The CSE subsequently prepared an IEP for the 2007-2008 school year. The IEP again recommended placing EB in a general education classroom, with consultant

teacher services in English and Social Studies, and with forty minutes of resource room each day. The IEP also recommended five 40-minute OT consultations and 10 hours of assistive technology support. The IEP indicated that the resource room was intended to help EB with organization, self-advocacy, time management, and writing skills. The IEP further stated that, "[d]ue to [EB's] dysgraphia, OT consultation will be provided to monitor [his] fine motor skills and provide modification strategies as necessary." The IEP also provided for various testing accommodations related to EB's dysgraphia.

On August 9, 2007, Plaintiff rejected the IEP proposed for the 2007-2008 school year. Plaintiff indicated that the IEP was deficient for the same reasons that the prior year's IEP had been deficient. In that regard, Plaintiff stated, in relevant part:

> The [CSE] recommended two "Co-taught" classes with a maximum of 24 students of which at most 8 have an IEP taught by a general education teacher and a resource teacher. We believe this arrangement would not meet [EB's] current learning needs due to his dysgraphia, language-based learning disability and organizational issues. [EB] currently continues to need intense remediation for his language-based learning disability. As you know, his abilities improved in the 2006-2007 school year at the GOW School. There were some bright points, and general improvement compared to the 2005-2006 school year, and earlier years. However, [EB] did not catch up.
>
> ***
>
> We believe [EB] needs full-time small group instruction in classes that are academically at grade level and [that] will provide the remediation for his missing writing skills. The CSE has not proposed such a program.
>
> ***
>
> We do not believe at this time that the program proposed by the CSE will be able to provide [EB] with an appropriate education. We do not believe that the mainstream program is designed to remediate [EB's] missing skills or give him the proper tools necessary to even out the playing field. We do not believe that the technology used in the mainstream classes would be enough for [EB]. We do not believe that the public school has an integrated technology program throughout the day that can meet [EB's] educational needs to compensate for his dysgraphia and writing

13

difficulties.

EB subsequently attended the tenth grade at Gow.

On November 16, 2007, Gow prepared an Advisor Report concerning EB. The report included the following statement:

> It seems as if [EB] has met success in some classes, and continues to have difficulty with others. Most of his difficulty seems to focus around his homework assignments. [EB's] teachers and I will continue to support [him] in completing his assignments in a timely manner[.]

A similar Advisor Report dated February 7, 2008 noted, in part:

> I will speak to [EB] about how to effectively manage his time in study hall, as he has had some late or incomplete assignments. I will also ensure that he is attending tutorials. . . . [EB's] [English] preparation and homework grades dropped in recent weeks due to his inability to submit homework on time.

EB's report card from Gow, for the 2006-2007 school year, indicates that he received the following grades: English B (despite grades of D- on the midterm and final exams); Global History C+; Algebra C; Health C-; Physical Science B-; Reconstructive Language B-; and Computer A-.

On December 6, 2007, Plaintiff demanded a due process hearing under IDEA, on the grounds that Defendant had failed to provide EB with a free appropriate public education ("FAPE") during the 2005-2006, 2006-2007, and 2007-2008 school years. Plaintiff demanded an award of additional services for the 2005-2006 year, and tuition reimbursement for the later years. With regard to the 2005-2006 school year, Plaintiff stated that EB experienced "numerous difficulties," and had not made "meaningful progress in meeting his IEP goals." Plaintiff stated: "[EB] was unable to plan, write, and complete written assignments independently and on time. . . . Most importantly, the

district failed to provide [EB] with effective instruction designed to remediate his writing difficulties . . . and failed to provide [him] with assistive technology that could have assisted him in the writing process."  As for the 2006-2007 school year, Plaintiff stated that EB "has major writing deficiencies, and that the district was not going to provide [EB] with a specialized writing program."  Plaintiff stated that the IEP required EB to attend regular education classes, "with no supports along with two co-taught classes per day," and with forty minutes per day in the resource room.  Plaintiff complained that such IEP would not provide EB "with the intensive and individualized instruction he needed."  Plaintiff stated that while EB was of "average intelligence, his handwriting [was] almost completely illegible."  Plaintiff stated, "[EB's] writing problems are pervasive, and he needs small group instruction in order to receive intensive intervention across all subject areas."  Plaintiff further stated that EB's time in the resource room should have been focused on writing, rather than on organization and self-advocacy skills.  As for the 2007-2008 school year, Plaintiff complained that the IEP was "essentially the same" as the previous year's IEP, and was "inappropriate" for the same reasons.  Plaintiff maintained that the 2007-2008 IEP did not provide for an appropriate transition plan, and that EB's "severe writing problems will likely significantly impact his future employment prospects and his ability to function independently."

In response to Plaintiff's demand for a due process hearing, Defendant appointed George Kandilakis as an impartial hearing officer ("the IHO").  With regard to the 2005-2006 claim, Plaintiff indicated to the IHO that she was seeking an award of additional services, consisting of 400 hours of tutoring.  Defendant moved to dismiss the claim, arguing that it was barred by the two-year statute of limitations contained in 8

15

NYCRR § 200.5(j).  In response to the motion to dismiss, Plaintiff submitted an affidavit,

stating, in relevant part:

> In the Spring of 2006, my husband and I began to recognize that the
> Pittsford Central School District was not providing an appropriate program
> to address [EB's] special needs.  In particular, I realized that the school
> district was not providing any support for [EB's] deficits in executive
> functioning,[10] a complaint I started communicating to district staff in March
> of 2006.

(Mrs. EB affidavit, ¶ ¶ 2-3).  On February 12, 2008, the IHO granted Defendant's motion

to dismiss the claim relating to the 2005-2006 school year, on the grounds that it was

time-barred.  The IHO did not conduct an alternative analysis of the merits of the claim.

With regard to the remaining claims, the IHO subsequently conducted a hearing

lasting several days.  On May 2, 2008, the IHO denied Plaintiff's request for

reimbursement during the 2006-2007 and 2007-2008 school years.  In his written

decision, the IHO noted that EB's cognitive ability was in the "average to above average

range." (IHO decision at 15).  The IHO stated that EB's strengths included reading

comprehension, vocabulary, and mathematical operations, and that his weaknesses

included written expression, handwriting, and organization. (*Id*. at 16).  The IHO further

stated that despite EB's "various individual needs," he earned mainly B and C grades in

regular education classes, although he failed 8th grade Spanish.  With regard to the

proposed IEPs for 2006-2007 and 2007-2008, the IHO observed that the CSE had met

in accordance with New York State educational regulations, and that it received and

utilized independent testing reports provided by Plaintiff. (IHO decision at 15).  The IHO

---

[10]Patricia Brogan ("Brogan"), Defendant's Director of Special Education, described the term "executive functioning" as follows: "[E]xecutive functioning really is the planning and organizing, sequencing and reviewing of what you are doing.") (Brogan hearing testimony at 159).

noted that EB's placement was to be in a general education classroom "with special education through a daily resource room and a daily consultant teacher in English and social studies," and with related services provided by an occupational therapy consultant and an assistive technology coordinator. (*Id*. at 16). With regard to consultant teacher services, the IHO stated:

> The daily Consultant Teacher program in both his English and Social Studies . . . classes would . . . support [EB] in those areas as well as [those] noted in the IEP goals. The parent raised concerns as to the class size in [EB's] co-taught English and Social Studies classes. Classes average approximately 24 students. There would be approximately 8 students with disabilities within these classes. He would also receive resource room on a daily basis with a student teacher ratio of 5:1 The opportunity to address his individual needs is amply provided [for] in those two special education programs.

(*Id*. at 18).

With respect to the 2007-2008 IEP, the IHO indicated that the CSE had met and reviewed information provided by Gow, including test results, and had prepared an appropriate IEP. Specifically, the IEP called for placement in the general education program, with daily resource room and consultant teacher services for English and Social Studies, as well as Assistive Technology and Occupational Therapy support. (*Id*. at 23). The IEP further provided for EB to have the use of a tablet PC, and for testing modifications. The IEP included transition planning, including participation in a 10th grade health class career inventory assessment. (*Id*. at 24).

The IHO also compared EB's performance at the district compared with his performance at Gow, and found them to be "remarkabl[y] similar." The IHO further found that the comments of EB's teachers at the Gow School were "remarkably similar" to those of his teachers at the district, and focused on EB's difficulty completing

assignments in a timely manner, his short attention span, and his failure to make good use of support services provided to him. (*Id*. at 17).  The IHO stated: "Given that the Gow School offers a small teacher ratio, after[-]school tutorials and Saturday study halls, it is surprising that the teachers' observations of [EB's] work habits did not improve significantly given the level of support that he received, during his 9th grade at the Gow School." (*Id*. at 19).  Moreover, the IHO found that the Gow School was not the least restrictive environment for EB. (*Id*. at 20).

The IHO observed that some evaluation reports indicated that EB showed "questionable effort," and resisted using technology consistently. (*Id*.) ("It was also indicated in some of the reports that the student showed questionable effort; does not use technology consistently or independently, but has the tools to achieve successfully; does not consistently utilize the strategies and modifications provided in order to help him with the challenges of dysgraphia.").  Nevertheless, the IHO found that a functional behavioral assessment[11] ("FBA") was not necessary, because the district staff addressed EB's behaviors, "by providing him with an extra set of books, copies of teachers' notes, use of a scribe, use of a word processor, use of prompts by classroom teachers, preferential seating and minimizing his environmental distractions as well as enhance[d] communications among and between his teachers, as well as with the parents to ensure he met the requirements of his courses." (*Id*. at 17-18).

Plaintiff appealed the IHO's decision, and on July 23, 2008, the State Review

---

[11] "An FBA is 'the process of determining why the student engages in behaviors that impede learning and how the student's behavior relates to the environment.'" *A.C. v. Board of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 169 (2d Cir. 2009) (citing 8 NYCRR § 200.1(r)).

Officer ("SRO") for the New York State Department of Education affirmed the IHO's decisions and dismissed the appeal. The SRO conducted a detailed review of the various evaluations that were performed on EB by the district. (SRO decision at 2-3). The SRO further noted that the CSE met six times over the course of five months in developing EB's IEP for the 2006-2007 school year. The SRO observed that the IEP proposed that EB receive various services, including the following: Consultant teacher services in English and social studies; resource room for forty minutes each day; 20 hours of assistive technology services; and five forty-minute occupational therapy sessions. The SRO also noted that in August 2007, the CSE met twice to prepare an IEP for EB, which recommended that he receive essentially the same services as contained in the prior year's IEP. (SRO decision at 4-5). The SRO summarized Plaintiff's objections to the IEPs as follows:

> According to the parents, the district failed to ascertain the reasons for the student's inconsistent use of assistive technology and instructional strategies or provide appropriate assistive technology; and failed to address the student's dysgraphia, reading difficulties, written expression problems, organizational difficulties, need for structure, self-advocacy problems, and need for intensive individualized instruction. The parents assert that the district failed to provide an appropriate transition plan for the student. The parents also assert that the 2006-07 IEP failed to provide the student with sufficient structure and support to complete his homework and [that] the CSE failed to recommend a placement in the least restrictive environment (LRE). The parents assert that the 2007-08 IEP and recommended placement are deficient for the same reasons as the 2006-07 IEP, and that both IEP's failed to distinguish between providing direct and indirect consultant teacher services.

(SRO decision at 6-7). With regard to least restrictive environment, Plaintiff argued before the SRO that Gow was the least restrictive environment, because EB needed an extended-day program.

The SRO reviewed the relevant legal principles. (SRO decision at 7-10). The SRO then found, first, that Plaintiff's claim for additional services for the 2005-2006 school year was time-barred, because the claim had accrued in November 2005, which was more than two years before Plaintiff demanded an impartial hearing in December 2007. The SRO did not alternatively address the merits of Plaintiff's claim concerning the 2005-2006 IEP.

The SRO next concluded that the 2006-2007 and 2007-2008 IEPs were appropriate. In that regard, the SRO reviewed EB's "present levels of performance," and found that the IEPs "reflected [EB's] needs in a detailed manner that was consistent with progress and teacher reports, and included information about private testing and requests made by [EB's] parents." (SRO decision at 11-12). The SRO noted that the 2006-2007 IEP listed 38 specific needs that EB had, and that the 2007-2008 IEP listed 39 needs. (*Id*. at 12). For example, the SRO indicated that the IEPs explained that EB needed "assistive technology including (1) computerized templates provided for written assignments, such as labs or essays; (2) the student to be [sic] taught how to create or access templates for frequently used writing assignments; and 3) encouragement of the student to use recommended software for math and science work." (*Id*. at 13). Additionally, the SRO noted that the IEPs described  EB's needs in the areas of auditory prompting, organization and planning, and self-advocacy. Overall, the SRO found that the IEPs accurately reflected EB's needs and were "reflective of the evaluations of the student." (*Id*. at 13). For example, with regard to EB's "auditory needs," the SRO discussed how the IEP recommended such things as "oral directions given in close proximity and repeated, if necessary," "frequent teacher checks to ensure

that the student is on task," "adequate wait time to process information," and "preferential seating to support 'right ear' advantage." (*Id.*). The SRO also found that the district provided appropriate assistive technology. For example, the SRO stated that the 2006-2007 and 2007-2008 IEPs called for EB to use templates for labs and writing assignments. The SRO also observed that the IEPs called for "an assistive technology coordinator [who] would work across all settings with regular education teachers to train and support the current technology available to the student, as well as to ensure its integration into his academic day." (*Id*. at 16).

Further, the SRO rejected Plaintiff's contention that the district had failed to ascertain the reasons why EB did not want to use such technology. In that regard, the SRO observed that, according to EB, he felt self-conscious using his computer, because the other students were not doing so. The SRO additionally found that the IEPs "recommended co-taught classes with a student-to-teacher ratio of 8:1 for both English and social studies," which would "support the student in addressing his organizational and writing strategies." (*Id.*). The SRO also discussed the IEP's call for testing accommodations, including the use of a word processor with spell and grammar check features. The SRO further found that the IEPs contained appropriate transition plans, which "included a detailed coordinated set of transition activities to facilitate the student's movement from school to post-school activities." (*Id*. at 16). The SRO noted, for example, that the IEPs transition plans included completion of an online survey to assess EB's areas of interest, exploration of options to job shadow in a field of interest such as business, and role-playing with teachers to enable EB to feel more comfortable approaching them for extra help. The SRO reviewed the specific goals and objectives

contained in the IEPs, and found that they were appropriate, detailed, and measurable. (SRO decision at 14-15). Overall, the SRO found that the IEPs "were reasonably calculated to provide the student with educational benefits, and [that] the district offered the student an appropriate educational placement." (*Id*. at 16).

On October 10, 2008, Plaintiff commenced this action. Plaintiff maintains that the 2005-2006 claim for additional services is timely, because it did not accrue until the Spring of 2006. Plaintiff further maintains that the District did not provide EB with a FAPE during the 2005-2006 school year, and that EB is entitled to additional remedial services for that year. Further, Plaintiff alleges that the district denied EB a FAPE during the 2006-2007 and 2007-2008 school years. Plaintiff also maintains that Gow was an appropriate placement for EB. Defendant, on the other hand, contends that Plaintiff's 2005-2006 claim is time-barred. Defendant further argues that all three of the IEPs were procedurally and substantively appropriate.

On December 23, 2009, Defendant filed its motion for summary judgment [#17], and on January 4, 2010 Plaintiff filed her cross-motion for summary judgment [#19]. On March 25, 2010, counsel for the parties appeared before the undersigned for oral argument of the motions. As discussed above, with regard to the 2005-2006 school year, Plaintiff had asked the IHO to award 400 hours of tutoring, to compensate EB for the denial of FAPE during that year. During oral argument, the Court asked Plaintiff's counsel to clarify what type of additional services Plaintiff was seeking, to which Plaintiff's counsel responded, "At this point, some years have gone by, and the student is actually about to graduate from the Gow School, and go to college. So, understanding that remedies here are equitable remedies and may be flexible, we may

ask for something different since four hundred hours [of tutoring] at this stage really isn't going to help [EB]." Plaintiff's counsel suggested that the Court could fashion "some type of equitable remedy" that could help EB in college.

DISCUSSION

*Rule 56*

Generally, summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed .R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996). Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED.

23

R. Civ. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

However, as will be discussed further below, in the context of an IDEA claim, the standard is different, since the Court is reviewing the sufficiency of an administrative decision: "Summary judgment in this context involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." *A.C. ex rel. M.C. v. Board of Educ. of The Chappaqua Central School Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (citations omitted).

*Legal Principles Applicable to IDEA Claims*

Plaintiffs in this case seek reimbursement for the cost of private-school tuition at the Gow School for academic years 2006-2007 and 2007-2008. Additionally, they seek additional services for the 2005-2006 school year, when EB attended Pittsford Central Schools. Such claims may be brought under IDEA. *T.P. ex rel S.P. v. Mamaroneck Union Free School Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) ("Parents who believe that the state has failed to provide [a free appropriate public] education may pay for private services and seek reimbursement from the school district for expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP.") (citation omitted). The legal principles generally applicable to such claims are well settled:

[A]ll children with a disability [are] entitled to a free and appropriate public

24

education under the IDEA. See 20 U.S.C. § 1400(d)(1)(A). . . . [T]he centerpiece of the IDEA's education delivery system is the individualized education program, or 'IEP.' The IEP, the result of collaborations between parents, educators, and representatives of the school district, sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives. If a disabled child's parents are dissatisfied with the IEP, as here, they may file a complaint with the state educational agency. There, the complaint will be heard by an impartial hearing officer ("IHO"), 20 U.S.C. § 1415(f), whose decision may be appealed to a state review officer ("SRO"), § 1415(g). The child's parents can, in turn, appeal this decision to a federal or state court. See § 1415(i)(2)(A).

*T.Y. v. New York City Dept. of Educ.*, 584 F.3d 412, 415-416 (2d Cir. 2009) (citations and

internal quotation marks omitted), *pet. for cert. filed*, 78 USLW 3531 (Mar. 5, 2010). Once

an action has been commenced in federal court,

the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed. While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy. Therefore, as the Supreme Court has concluded, courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).[12]

*Id*. at 417 (some citations omitted). With regard to this standard of review, the Second

Circuit has further stated:

The district courts are required to give "due weight" to the findings of a state administrative proceeding, and the "preponderance" review provision set forth in § 1415(e)(2) "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." [*Board of Educ. v. Rowley*, 458 U.S. 176, 207,

---

[12] *Id*. at 418 ("Though the court must show deference to administrative board findings, the court is also empowered to conduct an independent review of the record as a whole and even hear additional evidence.") (citing 20 U.S.C. § 1415(i)(2)(C)).

102 S.Ct. 3034 (1982)]. Requiring the federal courts to defer to the findings of the state administrative proceedings ensures that the federal courts do not "impos[e] their view of preferable educational methods upon the States." *Id.* at 207, 102 S.Ct. 3034.

This Court has acknowledged that *Rowley* requires that federal courts defer to the final decision of the state authorities. As we have noted, deference is owed to state and local agencies having expertise in the formulation of educational programs for the handicapped. Indeed, we have cautioned that in reviewing state administrative determinations under the IDEA the federal courts must be careful not to impose a particular substantive educational standard on the state.

*Muller on Behalf of Muller v. Committee on Special Educ. of East Islip Union Free School Dist.*, 145 F.3d 95, 101 (2d Cir. 1998) (citations omitted).

### Tuition Reimbursement Claims for 2006-2007 & 2007-2008 School Years

As to claims for tuition reimbursement, courts are required to engage in a three-step analysis:

First, we examine whether the state has complied with the *procedures* set forth in the IDEA. Second, we consider whether the proposed IEP is *substantively* appropriate in that it is reasonably calculated to enable the child to receive educational benefits. Only if the IEP is procedurally or substantively deficient do we reach the third step and ask whether the private schooling obtained by the parents is appropriate to the child's needs. In fashioning relief, equitable considerations relating to the reasonableness of the action taken by the parents are relevant.

*T.P. ex rel S.P. v. Mamaroneck Union Free School Dist.*, 554 F.3d at 252 (emphasis added; citations omitted). Moreover, "[a]s the party commencing the administrative review, the parents bear the burden of persuasion as to the inappropriateness of [the defendant's] IEP and the appropriateness of the private services." *Id.* (citation omitted). In considering whether a defendant school district complied with IDEA's procedures, a court should "focus on whether the parents had an adequate opportunity to participate in the development of the IEP." *Id.* at 253 (citation omitted). Additionally, while "adequate compliance with the

procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP[,] . . . it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *A.C. ex rel. M.C. v. Board of Educ. of The Chappaqua Central School Dist.*, 553 F.3d at 172 (citations omitted).    Moreover,

> [a] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement.  School districts are not required to furnish every special service necessary to maximize each handicapped child's potential.

*Id*. at 254 (citations and internal quotations omitted).  On this point, "because administrative agencies have special expertise in making judgments concerning student progress, [the court's] deference is particularly important when assessing an IEP's substantive adequacy." *T.Y. v. New York City Dept. of Educ.*, 584 F.3d at 418 (citation and internal quotation marks omitted); *see also, Cerra v. Pawling Cent. School Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) ("In order to avoid impermissibly meddling in state educational methodology, a district court must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan.") (citation and internal quotation marks omitted); *Watson v. Kingston City School Dist.*, 142 Fed.Appx. 9, 10, 2005 WL 1791553 at *1 (2d Cir. Jul. 25, 2005) ("That privately hired experts recommended different teaching methodologies for [the child] does not undermine the deference the Court must pay to the District.").  Furthermore, "when a learning-disabled child is in a mainstream class, the attainment of passing grades and regular advancement from grade to grade will generally constitute evidence of satisfactory progress." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d at 196 (citation and internal quotation marks omitted).

In this case, Plaintiff maintains that the District did not provide EB with a FAPE during the 2006-2007 school year.  For example, Plaintiff alleges that the District did not address EB's deficits with specialized instruction or appropriate technology.  Plaintiff contends that the District "did not provide a systematic specialized writing program and an effective means of remediating EB's handwriting." *Id*.  Plaintiff also indicates that the District failed to provide "speech-to-text software" for EB to use on his tablet PC. Additionally, although the IEP called for EB to be placed in a "6+1 writing program," Plaintiff contends that such program is not intended to help students with the actual writing process, such as "pre-writing," writing a rough draft, editing, and revising, which is what EB needed.  Plaintiff further maintains that the District failed to address EB's "weakness in self advocacy," referring to his need to seek help when necessary from his teachers. *Id*. at 12. For example, Plaintiff states that one of EB's teachers acted as a "buffer" between EB and his other teachers, rather than allowing EB to voluntarily seek additional help from his teachers.  Plaintiff also alleges that the District failed to conduct a Functional Behavioral Assessment ("FBA"), to determine why EB engaged in self-defeating behaviors. *Id*. at 13; *see also, id*. at 14 ("The district's staff repeatedly complained that EB was inconsistent and lacked independence.  Despite these complaints, the CSE never attempted to assess the source of the underlying problem.") (citations omitted).  In addition, Plaintiff maintains that the District did not provide EB with a FAPE during the 2007-2008 school year.  In that regard, Plaintiff contends that the 2007-2008 IEP was "essentially an identical program" to the 2006-2007 IEP. *Id*. at 15.

However, applying the relevant legal principles set forth above, the Court finds that Plaintiff has not shown by a preponderance of the evidence that the 2006-2007 or 2007-

2008 IEPs were procedurally or substantively deficient. To the contrary, it appears that Defendant complied with IDEA's procedural requirements in preparing the IEPs. Moreover, it appears that the IEPs were substantively appropriate, in that they were reasonably calculated to enable EB to receive educational benefits.

The Court has considered Plaintiff's arguments, and finds that they lack merit. For example, Plaintiff alleges that EB's "teachers were less than cooperative in employing the technology recommended by Ms. Rochester," and that the district "never investigated" how this alleged lack of assistive technology support "impacted [EB's] behavior." (Plaintiff's Memo of Law in Support of Summary Judgment [#18-3] at 15). However, the record does not indicate that EB's teachers were ever less than cooperative, or that there was a lack of assistive technology support. Instead, the record indicates that EB understood how to use the assistive technology that he was provided, but chose not to do so.[13] On this point, Plaintiff contends that the district should have conducted an FBA to determine *why* EB refused to use the technology. The Court, though, determines that Defendant's decision not to conduct an FBA did not render the IEPs procedurally or substantively deficient, since the IEPs contained various strategies to motivate EB and to address his behaviors. *See, A.C. v. Board of Educ. of The Chappaqua*, 553 F.3d at 169 (Failing to conduct an FBA did not render an IEP procedurally deficient, since the school district otherwise complied with 20 U.S.C. § 1414(d)(3)(B)(I) in attempting to address the child's self-defeating behaviors.); *see also, E.H. v. Board of Educ. of Shenendehowa Cent. Sch. Dist.*, No. 08-4857-cv, 2009

---

[13]The 2007-2008 IEP indicates that EB did not see the point of taking class notes, because he did not use them to study. ("At school, he reports that he prefers to do what everyone else does in class and that he sees very little difference with receiving a copy of notes, partially complete notes, or taking them entirely on his own. He reports that he does not use them to study.").

WL 3326627 at *3 (2d Cir. Oct. 16, 2009) (Plaintiff-parent alleged that IEPs were deficient because they "failed to address [student's] behaviors with the potential to impede his learning"; the Circuit Court rejected the challenge, since the IEPs "address[ed] [the student's] needs, techniques his teachers [could] employ, and skills he should acquire."). In this case, for example, the 2007-2008 IEP states: "[EB] needs to be seated in an area of the room where he can receive multiple prompts and assistance. . . . [EB needs [c]omputerized templates provided for written assignments, such as labs or essays . . . [t]o be taught how to create or access templates for frequently used writing assignments . . . [and] [e]ncouragement to use recommended software (efofex) for math and science work (2007-2008 IEP at 5).

Plaintiff also argues that "no specialized writing program was offered, either in 2006/07 or 2007/08; rather, EB was to be placed in a mainstream classroom where general education writing instruction was provided." (Plaintiff's Reply Memo in Support of Summary Judgment [#24] at 2). The Court again disagrees with Plaintiff's argument. The IEPs recommended placing EB in a general education classroom, with consultant teacher services in English and Social Studies, so that EB could obtain additional writing support. Such services were recommended for English and Social Studies, because those classes are "heavily laden with writing responsibilities." (Brogan hearing testimony at 373). Defendant also provided EB with writing assistance in the resource room.

Plaintiff further alleges that the district "failed to address EB's dysgraphia and weakness in written expression." (Plaintiff's Memo in Support of Summary Judgment [#18-3] at 10). However, the record indicates that EB was capable of writing legibly. In any event, Defendant arranged for EB to use a computer to take class notes and complete

writing assignments, but he frequently chose not to use such technology, even though he was a proficient typist.[14]  Additionally, Defendant provided resource room and OT to address EB's writing abilities.  For example, in explaining why the 2007-2008 IEP provided for resource room in addition to the co-taught classroom, the IEP stated:

> [EB] requires more intensive support in a smaller ratio to address specific weaknesses in the areas of written expression, organization and graphomotor skills.  When working with [EB], in the small group setting of resource room, he is more likely to utilize and practice strategies for dysgraphia.

(2007-2008 IEP at 9).  And finally, Dr. Sorman, Plaintiff's independent neuropsychologist, indicated that due to dysgraphia, EB's handwriting was not likely to improve.

Additionally, Plaintiff maintains that the district "interfere[d] with EB's opportunity to practice self-advocacy," because Sabbour advocated for EB and acted as a "buffer" between him and his general education teachers. (Plaintiff's Memo of Law in Support of Summary Judgment [#18-3] at 13).  This argument is unconvincing, considering that Plaintiff frequently interceded on EB's behalf with faculty members and administration.  If anyone interfered with EB's ability to practice self-advocacy, which the Court does not necessarily agree happened, it was Plaintiff.  Moreover, the IEPs addressed EB's need to improve his self-advocacy skills. (*See, e.g.*, 2007-2008 IEP at 2-3: "Resource Room Services will focus on organization and developing self-advocacy skills to help [EB] manage his time and workload. . . . [EB] feels more comfortable advocating and seeking assistance in a small group setting.").  The IEPs also contained specific strategies to

---

[14] The fact that EB's parents provided him with a tablet PC, as opposed to the District providing it, is of no moment.  The significant fact is that he had the tablet PC, but apparently chose not to use it most of the time.  Additionally, the District made other computers available to EB.

improve EB's self-advocacy skills. (*See, e.g., Id*. at 6).

Because the Court finds that the IEPs were procedurally and substantively appropriate, the Court does not need to consider whether placement at Gow was an appropriate placement. For all of the foregoing reasons, Defendant is granted summary judgment with respect to the 2006-2007 and 2007-2008 IEPs, and Plaintiff's request for tuition is denied.

### *Statute of Limitations for 2005-2006 "Additional Services" Claim*

The relevant statute of limitations in this case is two years. In that regard, claims under IDEA are subject to a two-year statute of limitations, unless state law specifically provides otherwise. 20 U.S.C. § 1415(f)(3)(C) ("A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.").[15] New York State has specifically adopted a two-year limitations period. N.Y. EDUCATION LAW § 4404[1][a]. Such limitations period accrues, for purposes of IDEA, "when the plaintiff knows or has reason to know of the injury that is the basis of the action." *M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 221 (2d Cir. 2003). Where a parent or guardian seeks reimbursement for tuition, the cause of action accrues, at the latest, when the parent removes the child from the defendant school district. *Id*. ("[I]t is clear that plaintiffs 'knew or had reason to know' of their injury when they withdrew M.D. from the Southington school system . . . because they believed that the

---

[15]Such provision became effective in July 2005. *Samoza v. New York City Dept. of Educ.*, 538 F.3d 106, 114 n.7 (2d Cir. 2008).

system was not providing her with an appropriate and adequate education.  At [that time], Mr. and Mrs. D. were aware that they would have a substantial monetary loss as a result of their decision.").

In the instant case, Plaintiff is not seeking tuition reimbursement for the 2005-2006 school year, since she did not enroll EB at the Gow School until the following academic year.  Instead, Plaintiff is seeking an award of "additional services for the failure to provide a FAPE for the 2005-2006 school year." (Complaint ¶ 10).  Specifically, Plaintiff requested "a bank of 400 hrs. of tutoring." *See, e.g.*, IHO Decision at 2 ("In a subsequent E-mail to the Respondent School District's representative, the Petitioner defined the 'additional services['] as a 'bank of 400 hrs. of tutoring.'").   Although, at oral argument, Plaintiff's counsel indicated that tutoring might no longer be an appropriate remedy.

The SRO determined that the claim for the 2005-2006 school year was not timely, because it accrued on November 2, 2005, which was the date that Plaintiff sent an email to the Defendant district, complaining about the lack of an assistive technology evaluation. (SRO Decision at 11).  Defendant responded to that complaint, and ultimately agreed to amend the IEP to include 20 hours of assistive technology training and support.  In other words, Defendant granted Plaintiff's request.  In his decision, the SRO observed that, despite being provided with additional assistive technology training and support, the parents were still dissatisfied with EB's performance.  On these facts, the SRO selected November 2, 2005 as the accrual date for Plaintiffs' claims for additional services during the 2005-2006 school year, apparently since that date was the first time that Plaintiffs expressed dissatisfaction with the IEP.

However, the Court disagrees and finds that the SRO's decision on that point is not

33

supported by a preponderance of evidence. Plaintiff alleges that the 2005-2006 IEP was deficient, because, in retrospect, it did not provide "support for [EB's] deficits in executive functioning." Plaintiff maintains that she first became aware of such deficiency in March 2006. The fact that Plaintiff sent an email in November 2005 complaining about the district's pace in implementing one aspect of the IEP does not support the conclusion that she knew about the injury of which she now complains. The Court finds that the 2005-2006 claim for additional services accrued in March 2006. Less than two years later, on December 6, 2007, Plaintiff demanded an impartial hearing. Consequently, the Court finds that the claim for additional services during the 2005-2006 school year is timely, and should not have been dismissed.

Remand to the IHO for a hearing is appropriate, since neither the IHO or SRO addressed the merits of Plaintiff's "additional services" claim, and since resolution of the claim would benefit from the administrative process. *See, Polera v. Board of Educ. of Newburgh Enlarged City School Dist*., 288 F.3d 478, 487 (2d Cir. 2002) ("The IDEA's exhaustion requirement was intended to channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and promptly resolve grievances. The exhaustion requirement prevents courts from undermining the administrative process and permits an agency to bring its expertise to bear on a problem as well as to correct its own mistakes. . . . [T]he administrative system is uniquely well suited to review the content and implementation of IEPs.") (citations omitted).

CONCLUSION

Defendant's summary judgment motion [#17] is granted with respect to Plaintiff's

claims for tuition reimbursement for the 2006-2007 and 2007-2008 school years, and those claims are dismissed. Defendant's application is denied as to Plaintiff's claim for additional services under the 2005-2006 IEP. Plaintiff's summary judgment motion [#19] is denied as to the 2006-2007 and 2007-2008 school years. Plaintiff's application is granted in part as to the 2005-2006 school year, to the extent that the claim is remanded to the IHO for further administrative proceedings.

SO ORDERED.

Dated: April 15, 2010
      Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge